ADAM FEE (Bar No. 345075)
adam.fee@weil.com
BEN NICHOLSON (Bar No. 317970)
ben.nicholson@weil.com
WEIL, GOTSHAL & MANGES LLP
1999 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Telephone: (213) 667-5100

Attorneys for ABRAHAM SHAFI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ABRAHAM SHAFI,<br><br>    Defendant. | Case No. CR25-00258-YGR<br><br>**ABRAHAM SHAFI'S NOTICE OF MOTION AND MOTION TO DISMISS THE INDICTMENT**<br><br>Hearing Date: September 4, 2026<br>Hearing Time: 10:00 a.m.<br>Judge:    Hon. Yvonne Gonzalez Rogers<br>Courtroom:  1, 4th Floor |

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE THAT on September 4, 2026, at 10:00 a.m., in the courtroom of the Honorable Yvonne Gonzalez Rogers, located at 1301 Clay Street, Oakland, California 94612, Abraham Shafi will, and hereby does, respectfully move for an order to dismiss the Indictment without prejudice.

This motion is based on the memorandum of points and authorities below, the Declaration of Adam Fee, the exhibits filed therewith, the files and records in this case, and any evidence or argument presented at a hearing on this matter.

Respectfully submitted,

DATED: July 20, 2026

WEIL, GOTSHAL & MANGES LLP

By: */s/ A. Fee*
ADAM FEE

Attorney for Abraham Shafi

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 1

I.      EXECUTIVE SUMMARY ................................................................................................. 1

II.     FACTUAL BACKGROUND .............................................................................................. 3

      A.      ABRAHAM SHAFI CO-FOUNDED IRL ............................................................. 3

      B.      ATTORNEY-1 REPRESENTED IRL...................................................................... 3

      C.      ATTORNEY-1 USES A FALSE "BOTS" THEORY TO TAKE
           CONTROL OF IRL AND TURN ITS INVESTIGATION AGAINST
           SHAFI ....................................................................................................................... 4

      D.      ATTORNEY-1 URGES THE GOVERNMENT TO CHARGE SHAFI................ 7

      E.      ATTORNEY-1 BECOMES CHIEF OF THE SECTION
           INVESTIGATING SHAFI ...................................................................................... 8

      F.      SHAFI SUES THE MEMBERS OF THE SPECIAL COMMITTEE ................... 8

      G.      SHAFI SEEKS TO RECUSE THE OFFICE BEFORE ANY CHARGING
           DECISION ................................................................................................................ 9

III.    LEGAL STANDARD ........................................................................................................ 10

IV.     ARGUMENT ...................................................................................................................... 12

      A.      ATTORNEY-1'S DUAL ROLE REQUIRES THE OFFICE TO RECUSE ........ 12

      B.      THE CONFLICT WILL CONTINUE AT TRIAL BECAUSE
           ATTORNEY-1 IS A NECESSARY WITNESS...................................................... 14

      C.      THE CONFLICT MERITS DISMISSAL AND REVIEW BY AN
           UNCONFLICTED PROSECUTOR'S OFFICE.................................................... 17

V.      CONCLUSION ................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Andric v. California*,
  55 F. Supp. 2d 1056 (C.D. Cal. 1999) .............................................................................. 16-17

*Berger v. United States*,
  295 U.S. 78 (1935) .................................................................................................................. 11

*Skains v. Lockler*,
  No. 06-cv-127, 2009 WL 230037 (E.D. Cal. Jan. 20, 2009) ................................................ 19

*United States v. Aguilar*,
  831 F. Supp. 2d 1180 (C.D. Cal. 2011) ................................................................................. 18

*United States v. Bundy*,
  968 F.3d 1019 (9th Cir. 2020)................................................................................................. 10

*United States v. Chanen*,
  549 F.2d 1306 (9th Cir. 1977)................................................................................................. 10

*United States v. De Rosa*,
  783 F.2d 1401 (9th Cir. 1986).................................................................................................. 11

*United States v. Dyess*,
  231 F. Supp. 2d 493 (S.D. W. Va. 2002) ............................................................................... 17

*United States v. Leibowitz*,
  420 F.2d 39 (2d Cir. 1969)...................................................................................................... 10

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020)........................................................................................... 11, 19

*United States v. Minkkinen*,
  No. 2:22-cr-00163, 2023 WL 3587757 (S.D. W. Va. May 22, 2023) ..........................2, 14-19

*United States v. Samango*,
  607 F.2d 877 (9th Cir. 1979)........................................................................................ 10, 11, 18

*United States v. Stites*,
  56 F.3d 1020 (9th Cir. 1995)................................................................................................... 18

*United States v. Williams*,
  68 F.4th 564 (9th Cir. 2023) ............................................................................................. 15, 18

*Wheat v. United States*,
  486 U.S. 153 (1988)....................................................................................................11-12, 17

*Young v. United States ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987) ............................................................................................ 11, 13, 19

**Other Authorities**

California Rules of Professional Conduct Rule 1.7 ................................................................. 5, 13

Model Rules of Prof'l Conduct r. 3.8 ........................................................................................ 11

Robert H. Jackson, The Federal Prosecutor, 24 J. Am. Judicature Soc'y 18 (1940) .................... 20

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   EXECUTIVE SUMMARY

On September 29, 2023, a private lawyer wrote to the government and asked it to charge Abraham Shafi. That lawyer was Attorney-1. She was hired by Shafi to represent the company Shafi founded and built, and she represented a powerful investor on its board—Investor-1. She urged the government to pursue Shafi, and Shafi alone. His own lawyer became his prosecutor.

Roughly two months later, in December 2023, Attorney-1 became Chief of the Corporate and Securities Fraud Section of the United States Attorney's Office for the Northern District of California (the "Office")—the Section that investigated and charged Shafi. Attorney-1 went from lobbying for Shafi's prosecution to a leader in the Office where the prosecutors who indicted Shafi worked on his case. In a system committed to fairness, that conflict should have compelled the Office to recuse. But it did not.

Prosecutors know what their leaders want. Attorney-1 wanted Shafi indicted. Her subordinates got the message. No screen fixes that. No wall blocks the gravitational pull of an office leader's agenda. The charging decision was compromised the day Attorney-1 walked in the door. This is not just about appearances. Attorney-1 built the case the government now prosecutes. She controlled what the government learned and when it learned it.

But she did more than investigate and report. She participated. Count Six charges fraudulent statements; Attorney-1 helped draft at least one of them. Count Eight charges obstruction by deletion of phone data; Attorney-1 collected the phone and directed the collection. Nothing was destroyed. The phone was restored from its own backup. And the government cannot point to a single byte of lost data. Yet Attorney-1 told the DOJ that her work proved a crime, and the government parrots her theory in the Indictment.

The case Attorney-1 shopped to the Office was itself a fallback. Attorney-1's primary theory, that 95% of IRL's users were fake "bots," was rejected by the company's

own counsel and independent consultants. Attorney-1 pressed it anyway, used it to dissolve a billion-dollar company, and delivered IRL's remaining tens of millions to her clients in the process. The government has since abandoned the bots theory; the Indictment does not charge it. But the Office has charged the remainder of Attorney-1's work after the bot theory fell apart.

Shafi flagged the conflict before he was indicted. The Office's response: Attorney-1 was recused; two prosecutors were screened. But that does not solve the problem because screening is "impossible when the conflicted attorney is a potential witness." *United States v. Minkkinen*, No. 2:22-cr-00163, 2023 WL 3587757, at *5 (S.D. W. Va. May 22, 2023). Attorney-1 is a fact witness. She has first-hand knowledge of Counts Six and Eight. No reasonable juror and no reasonable observer could view this prosecution as fair when a key witness is both Shafi's former lawyer and a former chief of the Office trying to convict him.

None of this was inevitable. From the moment Attorney-1 joined the Office, the conflict was obvious. So was the cure. The Office could have recused itself and transferred the case to another district, just as the Justice Manual contemplates and as the Department has done in materially similar circumstances. That step should have been taken the instant Attorney-1 arrived.

Shafi asked the Office to do exactly that. Long before any charging decision, he raised the conflict and requested a transfer repeatedly. The Office refused each time. A straightforward, well-worn path to neutrality was available, and the government declined to take it. Why? What made this case so important to keep, when the Department has handed off far less troubling conflicts? The most reasonable explanation is Attorney-1 herself: her influence, exerted from both sides of the public-private divide, made it hard for her former colleagues to let the case go.

Yet prosecutors serve the public. They do not carry water for former clients or powerful former colleagues. When the lawyer who pushed for Shafi's indictment as private counsel later leads a Section of the Office prosecuting the case, it is fiction to suggest that

the prosecutors can evaluate in a disinterested fashion the arguments and evidence that the Office leader helped to develop and push on the Office while in private practice. The government has had every opportunity to fix the problem. It has not. Shafi now moves to dismiss.

## II.    FACTUAL BACKGROUND

### A.    Abraham Shafi Co-Founded IRL

In 2016, Shafi co-founded Get Together Inc. (hereinafter "IRL") with a simple goal: to create a social network app that helps its members build connections and communities "in real life." The app launched publicly in 2018, two years after receiving seed funding, and grew quickly. IRL raised $8 million in a 2018 Series A round and another $16 million in a 2019 Series B round. In early 2021, IRL launched a Series C round led by Investor-1 and joined by Investor-2—a Silicon Valley venture capital firm that had backed IRL's Series A and Series B rounds. ECF 1 (Indictment) ¶¶ 7, 17, 23.

### B.    Attorney-1 Represented IRL

On August 22, 2022, the SEC issued a subpoena to IRL seeking documents about representations IRL had made to Investor-1 and Investor-2 during diligence for a Series C fundraising round. Ex. A (SEC Subpoena). The SEC primarily focused on a claim made by a former IRL employee that IRL inflated its number of users with "bots," which are not genuine human users of the app. *See id.*

Attorney-1 represented IRL in the investigation. Ex. B (Attorney-1 Engagement Letter). Attorney-1 advised Shafi in his capacity as IRL's CEO. In November 2022, IRL retained a second global law firm ("Firm-2") to help respond to the subpoena. Ex. C (Firm-2 Engagement Letter). As IRL's counsel, Attorney-1 participated in the events that became the subject of her DOJ subordinates' charges.

The government alleges that, in or around September 2022, Individual-1 was interviewed twice "as part of IRL's *internal* investigation." ECF 1 ¶ 31 (emphasis added). The government says Individual-1 "provided information about SHAFI's involvement in the

false invoices," without identifying what information Individual-1 provided. *Id.* The government alleges that before the second interview, Shafi "pressured Individual-1 to state that he was fully responsible for the false invoices," and that afterward he "berated Individual-1." *Id.* Attorney-1 appears to have gathered every one of those statements. Fee Decl. ¶ 26.

Count Six is a similar story. The government alleges that Shafi made false statements about its spending in a September 28, 2022 email to Investor-1. ECF 1 ¶ 27. Attorney-1 participated in drafting the very statement now charged as fraud. *See* Ex. D (Attorney-1 Email to IRL Counsel).

### C. Attorney-1 Uses a False "Bots" Theory to Take Control of IRL and Turn Its Investigation Against Shafi

In early 2023, IRL's internal investigation concluded that the claim that IRL inflated its number of users with "bots" was almost certainly false.[1] On January 17, 2023, Firm-2 briefed the Board on the preliminary findings. *See* Ex. E (January 2023 Board Presentation). Firm-2 reported to the Board that the third-party "bot score" was internally inconsistent: it rated just 3% of IRL's traffic as likely human in July 2022 but 75% by December 2022 and 87% in early 2023. *See id.* at 18. Discrediting the data, Firm-2 told the Board that the third-party vendor producing the data had "routinely" scored one of IRL's own lead engineers as a bot. *See id.* at 19. Firm-2 concluded that the third-party data had "only limited utility for spotting bots on IRL." *Id.* Firm-2 retained an independent consultant to assess the "bots" theory, *see id.* at 20, who ultimately concluded that IRL was not inflating its user metrics with "bots."

Eight days later, on January 25, 2023, IRL's Board formed a Special Committee to oversee the company's internal investigation into the issues the SEC was probing. Ex. F (Board's Written Consent). The members of the Special Committee included IRL's outside investors, including representatives of Investor-1 and Investor-2. *Id.* at 4. Soon after,

---

[1] Further analysis later confirmed it was false.

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

Attorney-1 asked Shafi to consent to her and Firm-1 representing both IRL and the Special Committee. Ex. G ¶ 122 (Shafi Amended Complaint in Delaware Action). Shafi refused. Ex. G ¶ 122.

Attorney-1's request presented a problem. Rule 1.7 of the California Rules of Professional Conduct provides that "a lawyer shall not, without informed written consent from each client . . . represent a client if the representation is directly adverse to another client in the same or separate matter." Cal. R. Prof'l Conduct 1.7(a). The conflict here was obvious. For months, Attorney-1 had represented IRL while the SEC investigated the representations IRL's management had made to the outside investors who now sat on the Special Committee.

Attorney-1 took on the Special Committee engagement anyway, over Shafi's objection. *Id.* And on March 20, 2023, Attorney-1 told the SEC that she represented the Special Committee. Ex. H (Attorney-1 Email to SEC).

Firm-2 still represented IRL after Attorney-1 moved to the Special Committee. But about three months into the new engagement, Attorney-1 insisted that the SEC route all IRL-related correspondence through her alone, sidelining Firm-2. *See* Ex. I (Firm-2 Email to SEC). From then on, the lawyers who had told the Board the bots data could not be trusted no longer spoke for the company. Attorney-1 did.

Nevertheless, the evidence *against* the "bots" claim kept mounting. In April 2023, Celerity, the independent consultant Firm-2 had retained, completed its months-long analysis and confirmed that the bot concerns were unfounded. *See* Ex. E at 19-21;[2] Ex. G ¶¶ 95–97. Google's metrics showed roughly 17 million authenticated human sign-ins to IRL that same month. Ex. G ¶ 7. And IRL's Vice President of Engineering twice reported to the Board that the platform had no significant bot problem. *Id.* ¶¶ 6, 98.

The Special Committee, through Attorney-1, responded by commissioning a report

---

[2] Pincites refer to the ECF and PDF page numbers, which do not always align with the page numbers within the exhibit because slipsheets have been added to the exhibits to identify them by exhibit letter.

to reach the opposite conclusion. In May or early June 2023, on the heels of Celerity's findings, the Committee retained Keystone, a consultancy whose assignment "was explicitly biased toward a particular outcome: to confirm the presence of bots on IRL." Ex. G ¶ 188.

Keystone issued an unsigned report that identified no authors. Ex. S (Keystone Report) at 4–8, 22, 52–53. Keystone's report relied on data from an experimental database missing between 45% and 65% of IRL's users, and which the report itself conceded was not the company's "source of truth" for user metrics. Ex. G ¶¶ 10, 190–94. Employees of Investor-2 later searched that database for their own activity on the platform and found their sessions missing. *Id.* ¶¶ 191–92. And the report counted the collapse in usage after Shafi's April 28, 2023 suspension as evidence of bots when the app had suffered repeated, days-long outages while under the management of Shafi's replacement as CEO—someone who had no experience with social media companies yet was hand-picked by IRL's venture capital investors, and who made no effort to bring users back to the platform after the outages were fixed. *See* Ex. S at 23–24; Ex. G ¶¶ 9, 156–60.

The verdict preceded the evidence. On June 15, 2023, the investor directors, with Attorney-1's assistance, formed "IRL Liquidation, LLC" before the Special Committee had received the Keystone Report. Ex. T (IRL Liquidation, LLC's Articles of Organization). Eight days later, on June 23, the Board voted to dissolve IRL. Ex. U. That same day, IRL announced that it was shutting down based on the incorrect claim that 95% of identified users were bots. *See* Ex. V (Letter signed by replacement CEO).

The announcement was false. It was also profitable. In dissolution IRL directed its remaining tens of millions to IRL's investors; common stockholders and employees received nothing. Ex. W (Notice to IRL Stockholders); Ex. G ¶¶ 114, 187. IRL then recast the directors then facing SEC questioning as victims of IRL's CEO.

The "bots" theory did not survive scrutiny. Within months, the Keystone Report's flaws were exposed in the Delaware Chancery litigation described below, where the court allowed fiduciary-duty claims against the investor directors over the dissolution to proceed

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

to discovery. *See infra* Section II.F; Ex. M. The government has since abandoned the theory as well. The early search warrants in this case relied on "bots" allegations, Ex. Y, yet the government's charges do not follow those pathways. Instead, the government charged statements about advertising spend and the restoration of a phone from its own backup. *See* ECF 1. The fallback theory Attorney-1 had reconfigured as her primary theory collapsed.

### D. Attorney-1 Urges the Government to Charge Shafi

By at least August 2023, the Office had opened a criminal investigation that ran parallel to the SEC's. Fee Decl. ¶ 26. The first-dated witness interview was of IRL's former Head of Engineering. *Id.* The interview memorandum shows that attorneys from both the SEC and the Office were in the room, including AUSA-1. *Id.* Attorney-1 was there too, representing the witness. *Id.* By then, Attorney-1 was representing IRL employees cooperating with the investigation targeting IRL and Shafi.

Attorney-1 also gave the government a "series of factual briefings" detailing "Shafi's conduct," along with "two privileged expert reports." *See* Ex. J (Attorney-1 Letter to the SEC) at 4. The first—the Keystone Report referenced above—discussed alleged "inauthentic users" on IRL's app; the second offered "forensic analyses of employees' devices and potential efforts to destroy materials that were potentially responsive to the SEC's investigative subpoenas." *Id.* That second report is the foundation of the obstruction charge—which claims that Shafi backed up his phone to delete records and thwart the investigation. Attorney-1 ran that process end to end: she told Shafi and other IRL personnel what they could and could not do with their devices once the investigation began, then collected, reviewed, and reported the contents of those devices to the government. *See* Ex. X (IRL June 20, 2023 Board Minutes).

Attorney-1 asked the government to act. In a September 29, 2023 letter to the SEC, she urged the agency to "focus its efforts on its case against [Shafi,] the founder/CEO" and to bring no charges against the company. Ex. J at 3. She noted that "[i]n several recent matters involving misrepresentations at pre-IPO companies where there was misconduct by

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

the founder CEO, the Commission had coordinated the timing of its complaint with the Department of Justice." *Id.* at 8. She pressed the SEC to follow suit: to "coordinate its filing against Mr. Shafi" and announce its case "with the Department of Justice, which [was] actively investigating the same set of facts." *Id.* at 7–8. She closed by reaffirming that IRL, under her representation, remained "committed to continuing to cooperate with these parallel investigations." *Id.* at 8.

### E.     Attorney-1 Becomes Chief of the Section Investigating Shafi

Roughly two months later, Attorney-1 switched sides again. In December 2023, she left private practice to become Chief of the Corporate and Securities Fraud Section of the Office. *See* Ex. K (Attorney-1's LinkedIn). That was the same Section that had been investigating Shafi and IRL, and the same Section with which she had been "cooperating" on the company's behalf. In a matter of weeks, she went from urging the government to "focus its efforts" on Shafi to leading the Office where the prosecutors were conducting the investigation into Shafi.

### F.     Shafi Sues the Members of the Special Committee

On November 15, 2023, Shafi and IRL's co-founder sued the Special Committee's members and their investment firms in the Delaware Court of Chancery. Ex. L (Shafi Complaint in Delaware Action). On April 10, 2024, while Attorney-1 led the Section, Shafi amended that complaint to broaden his claims, adding allegations about Attorney-1's conduct. Ex. G. The Amended Complaint alleges that, with Attorney-1's guidance, the Special Committee members breached their fiduciary duties of loyalty and good faith, placed their financial interests and reputations ahead of IRL's, and manufactured the false claim that 95% of IRL's users were bots to justify hastily dissolving the company. *Id.* ¶¶ 265–78. The Special Committee's strategy destroyed approximately $1 billion in value. *Id.* The Special Committee then scapegoated Shafi for the Special Committee's mismanagement. *Id.*

Attorney-1 actively participated in the Special Committee's strategy. *See id.* She

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

restricted access to information that undermined the bots narrative, refused to give board members more than a "thirty-minute window" to review critical evidence before the dissolution vote, stifled deliberation, and concealed her close relationship with IRL's investors. *Id.* ¶¶ 122, 182, 228–32. After engineering IRL's dissolution, and before joining the Office in December 2023, Attorney-1 told the SEC that any "enforcement action" against the company was "unwarranted and unnecessary" precisely because IRL had "ceased operations" and was now "defunct." Ex. J at 2–3, 6.

After denying the defendants' motions to dismiss, the Delaware Action was stayed pending resolution of this case. Ex. M (DE Order on Motions to Dismiss), Ex. N (DE Stay Order).

**G.     Shafi Seeks to Recuse the Office Before Any Charging Decision**

Shafi did not wait to be charged before raising the alarm about the Office's conflict. On May 16, 2024, he wrote to the Section's current Chief and the Executive Assistant U.S. Attorney. Ex. O (Shafi Letter to USAO). Shafi described Attorney-1's conflict, how it threatened the impartiality of the investigation, and why Attorney-1 was likely to be a trial witness. *Id.* Shafi explained that individual recusal could not safeguard impartiality, in fact or appearance. *Id*. at 2, 5. Shafi asked the Office to recuse itself before making any charging decision. *Id.*

The government responded three months later, on August 8, 2024, with two paragraphs. Ex. P (USAO Letter to Shafi). The Office said it was "not required" to recuse itself. *Id.* It claimed that "concerns regarding conflicts of interest and impartiality" were taken "seriously," and that "additional steps beyond the recusal of [Attorney-1]" had been taken. *Id.* The "additional steps" amounted to little: (i) giving "[p]rimary supervision" of the investigation to the Fraud Section of the Criminal Division in Washington, D.C.; (ii) adding a Fraud Section prosecutor to the team; and (iii) ending Attorney-1's supervision of the two lead attorneys on the case. *Id.* It remains unclear how Attorney-1 can be said to not supervise attorneys in the Office who were subordinate to her and over which she held a

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

leadership position.

The Office did not say whether it had followed DOJ's conflict protocol. But Section 3-1.140 of the Justice Manual directs the Office to contact the Executive Office for United States Attorneys' ("EOUSA") General Counsel "promptly" upon learning of a conflict, to "discuss whether a recusal is required," and let EOUSA chart the appropriate response. Ex. Q (Justice Manual). The Office never said whether it contacted EOUSA. *See* Ex. P. Nor did the letter address whether attorneys on the investigation beyond the named two were screened from Attorney-1. Nor did the letter address whether Attorney-1 herself took steps to circumvent the ethical wall DOJ had erected. Nor did it address whether the prosecution team visited their neighboring office to collect Brady material in the possession of Attorney-1.

On or about March 24, 2025, Attorney-1 left the Office and returned to private practice at a new firm. Ex. K. On August 26, 2025, the government indicted Shafi. *See* ECF 1.

## III.   LEGAL STANDARD

"A district court may dismiss an indictment under its inherent supervisory powers" not only to remedy violations of "statutory or constitutional rights" and "deter future illegal conduct," but also to "preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury[.]" *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (citations omitted). Included within that authority is the power to dismiss an indictment, with or without prejudice, where the manner in which the prosecution "sought and secured" the charging instrument threatens the fairness and legitimacy of the proceedings. *United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir. 1977); *accord United States v. Samango*, 607 F.2d 877, 885 (9th Cir. 1979). The Ninth Circuit recognizes that courts have exercised this authority in "widely-varying factual contexts" to achieve the same goal "'to protect the integrity of the judicial process.'" *Chanen*, 549 F.2d at 1309 (quoting *United States v. Leibowitz*, 420 F.2d 39, 42 (2d Cir. 1969)).

"[T]he facts of each case determine when Government conduct has placed in jeopardy the integrity of the criminal justice system." *Samango*, 607 F.2d at 884. And although dismissal is an extraordinary remedy, the law does not require a predicate finding that the government procured the indictment in bad faith. *United States v. De Rosa*, 783 F.2d 1401, 1406 (9th Cir. 1986). Because the goal is to protect the integrity of the process, not merely punish deliberate wrongdoing, "even unintentional misconduct may be sufficient." *Id*.

These legal standards are rooted in the prosecutor's obligation to serve as a "minister of justice and not simply that of an advocate." *United States v. Miller*, 953 F.3d 1095, 1104 (9th Cir. 2020) (quoting Model Rules of Prof'l Conduct r. 3.8 cmt. 1). The "United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all[.]" *Berger v. United States*, 295 U.S. 78, 88 (1935). "For this very reason, the Department of Justice holds United States Attorneys and their Assistants to exacting ethical standards, not least with respect to actual and apparent conflicts of interest." *Miller*, 953 F.3d at 1104.

The DOJ Justice Manual does not confine recusal to individual attorneys. Section 3-1.140, which addresses recusal of a U.S. Attorney's Office, provides that the "requirement of recusal" arises where "a conflict of interest exists or there is an appearance of a loss of impartiality." Ex. Q. The DOJ's own policy recognizes that when impartiality is impaired, or even appears impaired, the remedy is recusal of the Office, not merely of a particular prosecutor.

These principles reflect a broader constitutional imperative: judicial integrity turns on impartiality in both fact and appearance. As the Supreme Court explained, "[i]t is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987). Accordingly, "[f]ederal courts have an independent interest in ensuring that criminal trials

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

## IV.   ARGUMENT

### A.   Attorney-1's Dual Role Requires the Office to Recuse

Attorney-1 built the case against Shafi that the Office charged. *Compare* Ex. J (Attorney-1 Letter to the SEC) *with* ECF 1 (Indictment). And she built it for the benefit of her clients: IRL, Investor-1, and the Special Committee. She acted to assist institutional investors dodge the crosshairs of an SEC investigation. By pinning the blame on Shafi rather than IRL or its Board, those investors could cap their financial exposure and escape further regulatory scrutiny—scrutiny that caused far more concern for those investors than the success or failure of a single investment. Attorney-1 said as much in her September 29, 2023 letter to the SEC, urging the agency to spare her clients and "focus its efforts" on Shafi. Ex. J at 3.

Attorney-1 did more than shape a narrative. She choked off the channels through which contrary evidence might surface. She interfered with witnesses whose testimony exculpated Shafi, restricting their access to counsel and to client files. *See* Ex. R (Attorney-1 Emails to Counsel for SEC Witnesses). She conditioned file transfers to replacement counsel on her own approval, withheld previously authorized legal-fee payments, and slow-walked the return of seized devices holding exculpatory material. *Id.* In short, she made herself the investigation's gatekeeper. She directed IRL's then-counsel, Firm-2, to route all SEC communications through her. *See* Ex. I (Firm-2 Email to SEC). She became the government's principal point of contact, controlling what the government saw and learned.

Consider what that control buried. In January 2023, Attorney-1's soon-to-be clients heard Firm-2 explain that the data underlying the bots allegations was unreliable and that an independent analysis was underway to investigate the claims. Ex. E at 18–20; Ex. F at 4. By June, with Attorney-1 as their counsel, those same directors declared that 95% of IRL's users were bots and dissolved the company on that basis. Ex. V. The analysis that undercut

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

the claim? Attorney-1 withheld it until minutes before the dissolution vote, and denied a request to postpone the vote, depriving directors of the opportunity to review it before voting. Ex. G ¶ 231.

Attorney-1 then handed the government its theory. Ex. J. She accused Shafi of misappropriating millions and deceiving her clients, branding him a "wrongdoer" and casting her clients as his "victims." *Id.* at 3. She anchored those accusations in the "reports prepared at the direction of the Special Committee's counsel," meaning reports prepared under her own direction. *Id.* at 4. And she pressed the SEC to "coordinate" its complaint against Shafi with the DOJ's "parallel investigation[.]" *Id.* at *7–8*. Two months later, she was running the Section that ultimately did exactly what she asked. *See* Ex. K.

The timing is telling. The DOJ does not make hiring decisions for a leadership position overnight. There is a process which involves interviews, vetting, and background checks. Yet roughly two months separated Attorney-1's letter to the SEC from her December 2023 hiring. *Id.*

Attorney-1 was urging the SEC and DOJ to charge Shafi at the same time she was pursuing the job that placed her above the prosecutors investigating him. California Rule of Professional Conduct 1.7(b) required her to stop representing anyone connected to IRL or the Special Committee the moment her own interests entered the picture. The timing of Attorney-1's hiring suggests this did not happen.

There is a "fundamental premise" that the government must "wield its formidable criminal enforcement powers in a rigorously disinterested fashion." *Young*, 481 U.S. at 810. Attorney-1's involvement made the Office irreconcilably interested. By the time Attorney-1 arrived, the prosecutors in her Office already knew the result she wanted because she was on record saying it. *See* Ex. J. No screen, however well built, can unwind that knowledge or dispel the appearance of partiality created. And no screen can remove the tainted impression Attorney-1 left on the prosecutors making the charging decisions.

The risk of prejudice is especially acute because Attorney-1 helped build evidence

on which the charges rest. By her own account, Attorney-1 supplied "expert reports," identified "potential sources of evidence," flagged "key witnesses," and "facilitated" their interviews. *See* Ex. J at 4. The Office turned that work into criminal charges. For example, Count Six depends on an email Attorney-1 helped draft. *See* Ex. D; ECF 1 at 13. And Count Eight revolves around Attorney-1's collection and analysis of Shafi's personal cellphone. *See* Ex. X; ECF 1 ¶ 32.

No reasonable observer could call this process impartial. How could the prosecutors independently evaluate a case their section chief helped build and advocated for them to bring? The government used evidence Attorney-1 developed. The Office made charging decisions Attorney-1 encouraged when a private attorney, after that same attorney took command of the prosecutor's Office. Of course Attorney-1's hiring influenced the prosecutors. Of course the Office credited their leader's work. The appearance is the reality. And it corrodes public trust in the process. When a prosecutor's "ability to fairly evaluate evidence from his [or her] boss could reasonably be questioned," the law sees a risk of "mistrial." *Minkkinen*, 2023 WL 3587757, at *6. The Court should not let a case carrying that risk go forward.

**B.      The Conflict Will Continue at Trial Because Attorney-1 is a Necessary Witness**

Attorney-1's personal recusal cannot cure the conflict because she is also a fact witness. No ethical wall solves that problem. *See Minkkinen*, 2023 WL 3587757, at *5.

On at least two central issues, Attorney-1 will be a critical witness. *First*, Count Six alleges that Shafi committed wire fraud by making false representations in a September 28, 2022 email to Investor-1. ECF 1 ¶ 27. Attorney-1 helped write that email. Ex. D (Attorney-1 Email to IRL Counsel). Attorney-1's testimony bears directly on whether Shafi believed in good faith that he was saying nothing deceptive.

*Second*, Count Eight alleges that Shafi destroyed records in a federal investigation "by restoring his cell phone to [a] prior backup before imaging as part of [an] internal

investigation." *Id.* ¶ 38. Attorney-1 personally oversaw the preservation and collection of data from Shafi and other IRL personnel. Ex. X; *see also* Ex. J. She knows what was said to Shafi, and when and how her firm handled his device.

On both counts, Attorney-1 is a fact witness. She will be called, and both the defense and the Office will examine her. That alone creates an irreconcilable conflict that demands the Office's recusal.

Courts rarely order office-wide recusal, because U.S. Attorney's Offices usually have the good sense to step aside at the first appearance of a conflict. But in *Minkkinen* a West Virginia district court confronted the same problem we have here. 2023 WL 3587757 at *1. The court explained why a former office leader cannot serve as a fact witness in a case her former office is prosecuting while retaining the appearance of a fair proceeding.

In *Minkkinen*, two individuals were charged with theft of trade secrets, wire fraud, and false statements arising from their work at a company called Sagitec Solutions. *Id.* William Ihlenfeld, later the U.S. Attorney for the Northern District of West Virginia, had represented Sagitec in private practice. *Id.* at *2. In that role, he conducted an internal investigation into the same trade-secret issues that were the subject of an indictment, and "interviewed witnesses, including the Defendants, on the same topics at issue in th[e] criminal case." *Id.* Ihlenfeld spoke with both defendants before federal agents did, and those interviews gave rise to the government bringing false statement charges against the defendants. *Id.* Ihlenfeld then wrote a report concluding that the defendants had not misappropriated trade secrets. *Id. After* the case was charged, Ihlenfeld became U.S. Attorney. *Id.* at *3. The entire office recused save one AUSA, Andrew Cogar, and his support staff. *Id.*

On the defendants' motion, the court recused Cogar and his staff. *Id.* at *1. The reasoning was straightforward: "Recusing an office as a whole but allowing an attorney who remains employed by that office, whose promotions, commendations, job duties, and other conditions of employment remain largely at the discretion of the conflicted U.S. Attorney, to

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

continue acting as lead counsel, creates an appearance of impropriety." *Id.* at *5. Keeping "the attorney most involved in the case" as lead counsel even as the matter moved to another district, the court warned, "might reasonably cause the public to view the recusal as mere window-dressing." *Id.*

The court explained further the problem of a U.S. Attorney's Office conducting a trial in which its leader is a fact witness. Because Ihlenfeld might testify about "central issues" to the case "both the United States and the Defendants will need to explore those issues with Mr. Ihlenfeld both before and during trial." *Id.* That, the court found, made screening unworkable: "screening methods that may prevent one attorney's conflict from impacting others in the office are, of course, *impossible* when the conflicted attorney is a potential witness." *Id.* The problem was considered especially sharp because Ihlenfeld was a "leader of the office." *Id.*

The circumstances of *Minkkinen* are strikingly similar to what we have here. There, as here, a lawyer ran the company's internal investigation into a matter where the individual, but not the company, was later prosecuted. There, as here, the lawyer presented views on the charged conduct to the prosecutors. There, as here, the lawyer helped prepare a statement that became the basis of a charge. There, as here, the lawyer came to lead the office prosecuting the defendant. And there, as here, the lawyer was poised to take the stand at trial. On these facts alone, the Court should recuse the Office just as *Minkkinen* recused Cogar and his staff. Attorney-1's testimony creates the appearance of a conflict no screen can dispel.

A credibility issue also directly follows. As *Minkkinen* put it, "[t]he public could reasonably, and likely would, question Ihlenfeld's credibility if called as a witness by the Defendants simply because his employee, AUSA Cogar, is the lead prosecutor on the other side of counsel table." *Id.* at *6. The same is true here: the public could reasonably question Attorney-1's credibility if Shafi calls her, precisely because her former subordinates sit at the prosecution table. *See also Andric v. California*, 55 F. Supp. 2d 1056, 1069 (C.D. Cal.

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

1999) (disqualifying the defendant's entire governmental legal department because there was "too great a concern to be dispelled by an ethical wall" when the plaintiff was "planning to elicit testimony" from a lawyer who once represented the plaintiff and was then working for the defendant).

Once the conflicted attorney becomes a witness, the conflict stops being personal and turns institutional. That kind of conflict cannot be cured. The Office would have to weigh the credibility, conduct, and exculpatory knowledge of its own former leader while prosecuting the case she helped build. As *Minkkinen* recognized, that arrangement courts mistrial because a prosecutor's ability to fairly evaluate a former boss' evidence may "reasonably" be doubted and viewed through the lens of institutional loyalty. 2023 WL 3587757, at *6. At the very least, it implicates the Court's duty to ensure that proceedings "appear fair to all who observe them." *Id.* at *4 (quoting *Wheat*, 486 U.S. at 160).

Attorney-1's testimony forces the Office to make an impossible choice about how to address its former Section Chief's role in editing a statement that the Office has branded criminal. Excuse her role, and the Office signals that its prosecutors stand above the law. Attack her, and the Office must shred the reputation of its own former leader, collaterally damaging its own. *See United States v. Dyess*, 231 F. Supp. 2d 493, 497 (S.D. W. Va. 2002) ("possible testimony" from prosecutors was found to be "potentially prejudicial" to "the reputation of their office" because "revelation of wrongdoing, which may be required in the service of truth and justice to these defendants, cannot help but cause reputational injury to the office."). Whichever path the Office takes, this is the institutional conflict *Minkkinen* warned against. A prosecution cannot "appear fair to all who observe" it when the prosecutor must evaluate, present, and test evidence drawn from its own former leader. *Minkkinen*, 2023 WL 3587757, at *4.

### C. The Conflict Merits Dismissal and Review by an Unconflicted Prosecutor's Office

District courts have "substantial latitude" in deciding whether disqualification is

warranted. *United States v. Stites*, 56 F.3d 1020, 1024 (9th Cir. 1995). Disqualifying an entire U.S. Attorney's Office is, to be sure, "an extreme remedy" reserved for "the most extraordinary circumstances." *United States v. Williams*, 68 F.4th 564, 573 (9th Cir. 2023). But it becomes necessary when there is "a clear basis in fact and law." *Id.* (citation omitted).

That basis exists where (1) there is "a strong factual predicate for blanket disqualification" and (2) "continued representation of the government w[ould] result in a legal or ethical violation" because the "misconduct or conflict so pervades the office that less intrusive remedies would be inadequate to safeguard against a legal violation." *Id.* Pretrial dismissal, though equally extreme, is appropriate where "the manner in which the prosecution obtained the indictment represent[s] a serious threat to the integrity of the judicial process." *Samango*, 607 F.2d at 885; *see United States v. Aguilar*, 831 F. Supp. 2d 1180, 1210 (C.D. Cal. 2011) (dismissing indictment "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations[.]") (citation omitted).

This case meets that standard. Attorney-1 shaped the evidence behind the investigation, controlled the flow of information to the government, blocked the development and presentation of exculpatory evidence, marked Shafi as the target, and then took a leadership position in the Office where the prosecutors brought the charges for which Attorney-1 advocated. Because the conflict infected the manner in which the prosecutors obtained the indictment, dismissal without prejudice is the right remedy. *See Samango*, 607 F.2d at 885.

*Minkkinen* demonstrates what should have happened here—office-wide recusal. Yet this did not happen, even when there was a deeper conflict. Attorney-1 was not a lawyer who touched both sides after the charged events took place. She participated in the charged events themselves. No case we have found involves a conflict this extraordinary where the office nonetheless put its head down and pressed ahead. There is no good reason this Office charged this case, and no good reason it keeps it. Its refusal to recuse stains the appearance of impartiality that is supposed to be the hallmark of our system. And it breaks from

Department practice. In *Minkkinen*, the district promptly disclosed the conflict to EOUSA and handed the investigation to another district. 2023 WL 3587757, at *3-6. This Office did the opposite: it kept the case, took it to the grand jury, and continues to prosecute it.

*United States v. Miller* provides another example of what ought to happen when a conflict such as this arises. 953 F.3d 1095. There, the prosecutor held a *de minimis* interest in the victim company. *Id.* at 1099–1100. Once the conflict surfaced, the office's leadership recused the office and transferred the matter, ensuring the charging decision was made elsewhere. *Id.* at 1100, 1105. Because of the prompt office-wide recusal, the Ninth Circuit upheld the conviction that was later obtained. *Id.* at 1104–05. The court explained that there was an "obvious conflict of interest" and it was "totally inappropriate" to even appear to use prosecutorial contacts to "pull strings" in an investigation. *Id.*

This case is worse on every axis. The conflict here is deeper and more direct. The Office never stepped aside. It investigated the case, took it to the grand jury, and prosecutes it still. And based on the discovery produced to date, at least one of those prosecutors, AUSA-1, interviewed witnesses alongside Attorney-1 while Attorney-1 represented IRL. *See* Fee Decl. ¶ 26. AUSA-1 then became subordinate to Attorney-1 when Attorney-1 became Chief of the Section.

Nor has the Office cured the conflict. Main Justice's Fraud Section may now have some involvement in the case, but the Office has appeared as lead counsel. *E.g.,* ECF 6, 23, 25 (Minute Entries noting that counsel appearing for the government are AUSAs from the Office). The conflict so pervades the Office that its continued representation would violate Shafi's right to a fair trial. *See Skains v. Lockler*, No. 06-cv-127, 2009 WL 230037, at *24 (E.D. Cal. Jan. 20, 2009) ("Under the Due Process Clause of the United States Constitution, a criminal defendant is entitled to an impartial prosecutor."), *report and recommendation adopted*, No. 2009 WL 806829 (E.D. Cal. Mar. 26, 2009), *aff'd sub nom.*, *Skains v. California*, 386 F. App'x 620 (9th Cir. 2010); *Young*, 481 U.S. at 810 ("Prosecution by someone with conflicting loyalties calls into question the objectivity of those charged with

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR

bringing a defendant to judgment.") (internal quotation marks and citation omitted).

**V.      CONCLUSION**

This case bears the mark of what Justice Jackson called the "most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." Robert H. Jackson, The Federal Prosecutor, 24 J. Am. Judicature Soc'y 18 (1940). Shafi is before the Court because Attorney-1, as a private attorney serving paying clients, urged the Office to indict Shafi and spare her clients. The Office ultimately did just that, entirely predictably, after Attorney-1's credibility in the Office was enormously boosted by the Office hiring her as chief of the very department investigating Shafi. This is the opposite of the disinterested prosecution the Constitution promises.

For these reasons, Shafi respectfully requests that this Court grant his motion to dismiss the indictment without prejudice so that a neutral prosecutor's office capable of impartially assessing the evidence can evaluate the merits and determine whether this case ought to be prosecuted.

DATED: July 20, 2026

Adam Fee
Ben Nicholson
WEIL, GOTSHAL & MANGES LLP

By: */s/ A. Fee*
          ADAM FEE

Attorney for Abraham Shafi

SHAFI'S MOTION TO DISMISS
CASE NO. CR25-00258-YGR