CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

LORINDA I. LARYEA (DCBN 99769)
Chief, White Collar and Corporate Enforcement Section

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

SAILAJA PAIDIPATY (NYBN 5160007)
EVAN M. MATEER (CABN 326848)
Assistant United States Attorney

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680
FAX: (510) 637-3724
Evan. mateer@usdoj.gov

LAURA CONNELLY (DCBN 241537)
Acting Assistant Chief

U.S. Department of Justice
White Collar and Corporate Enforcement
1400 New York Avenue NW
Washington, DC 20005
Telephone: 202-307-1423
Laura.Connelly@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABRAHAM SHAFI,<br><br>Defendant. | Case No. CR 25-00258-YGR<br><br>**UNITED STATE'S OPPOSITION TO MOTION TO DISMISS** |

## TABLE OF CONTENTS


INTRODUCTION ..... IV

BACKGROUND ..... 2

A. Abraham Shafi founded Get Together Inc., developer of the mobile app IRL, which raised $170 million in Series C investments. ..... 2

B. After the SEC opened an investigation into whistleblower allegations that IRL was inflating its user metrics, IRL retained Attorney 1. ..... 2

C. IRL and its attorney's conducted an internal investigation into the SEC allegations. ..... 4

D. In January 2023, IRL's Board of Directors appointed a Special Committee to continue the internal investigation, which retained Attorney 1 as its counsel. ..... 5

E. The United States Attorney's Office opened a criminal investigation into IRL and Shafi. ..... 7

F. The Special Committee's investigation revealed misconduct by Shafi, who was then terminated as CEO. ..... 8

G. In June 2023, the Special Committee presented to the Board on the findings of its investigation, which then voted to dissolve the company. ..... 9

H. In September 2023, Attorney 1 sent a letter to the SEC, responding to its request for IRL's view on whether the SEC should pursue a civil case against IRL. ..... 10

I. In December 2023, Attorney 1 joined the United States Attorney's Office, which took several actions to mitigate any appearance of a conflict of interest. ..... 10

J. In March 2025, Attorney 1 left the United States Attorney's Office; in August 2025, the grand jury charged Shafi with fraud and obstruction of justice. ..... 12

LEGAL STANDARDS ..... 12

A. Recusal of United States Attorney's Offices ..... 12

B. Dismissal of an indictment ..... 14

ARGUMENT ..... 14

A. There Is No Basis For The Recusal Of The United States Attorney's Office ..... 15

1. There is no factual basis to disqualify the entire Office. ..... 15

2. The Office's continued representation will not violate any law or ethical duty. ..... 17

3. There is no ethical rule that requires recusal of the Office. ..... 18

4. Attorney 1's former role as a supervisor in the Office is not a basis for recusal. ..... 21

5. Even if Attorney 1 appears as a witness at trial, there is no reason members of the case team cannot fairly examine her. ....22

B. There Is No Basis To Dismiss The Indictment. ....24

CONCLUSION ....25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Charles Willie L.*,
63 Cal.App.3d 760, 132 Cal.Rptr. 840 (1976) ........ 19

*Matter of Grand Jury Investigation of Targets*,
918 F.Supp. 1374 (S.D.Cal.1996) ........ 13, 19

*Trone v. Smith*,
621 F.2d 994 (9th Cir.1980) ........ 19

*United States v. Bolden*,
353 F.3d 870 (10th Cir. 2003) ........ 12, 13, 14, 21

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020) ........ 14

*United States v. Caggiano*,
660 F.2d 184 (6th Cir.1981) ........ 13

*United States v. Jacobs*,
855 F.2d 652 (9th Cir. 1988) ........ 14

*United States v. Kearns*,
5 F.3d 1251 (9th Cir. 1993) ........ 14, 24, 25

*United States v. Lorenzo*,
995 F.2d 1448 (9th Cir.1993) ........ 19, 20, 23, 24

*United States v. Manna*,
Nos. CR 88–0239 DRD, CIV 97–2034 DRD, 2006 WL 3063456 (D.N.J. Oct. 25, 2006) ........ 13

*United States v. Mapelli*,
971 F.2d 284 (9th Cir.1992) ........ 19, 20

*United States v. Minkkinen*,
No. 2:22-CR-00163, 2023 WL 3587757 (S.D.W. Va. May 22, 2023) ........ 20, 21, 22, 23

*United States v. Nosal*,
No. C 08-00237 MHP, 2009 WL 482236, at *4 (N.D. Cal. Feb. 25, 2009) ........ passim

*United States v. Prantil*,
764 F.2d 548 (9th Cir.1985) ........ 12

*United States v. Rodella*,
59 F. Supp. 3d 1331, 1348–49 (D.N.M. 2014) ……………………………………………..passim

*United States v. Ross*,
372 F.3d 1097 (9th Cir. 2004) .......................................................................................... 14

*United States v. Thanh Viet Cao*,
526 F. App'x 798 (9th Cir. 2013) ................................................................................ 12, 23

*United States v. Vlahos,*
33 F.3d 758 (7th Cir.1994) .............................................................................................. 13

*United States v. Weiner,*
578 F.2d 757 (9th Cir.) ..................................................................................................... 19

*United States v. Whitaker*,
268 F.3d 185 (3d Cir. 2001)............................................................................................. 13

*United States v. Williams*,
68 F.4th 564 (9th Cir. 2023) ...................................................................................... passim

*Young v. United States ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987)......................................................................................................... 13

## INTRODUCTION

On April 13, 2023, the United States Attorney's Office for the Northern District of California (the Office) opened an investigation into allegations that Abraham Shafi, the CEO of Get Together Inc., lied to investors during a Series C private offering two years prior. The investigation opened upon learning information from the Securities and Exchange Commission ("SEC"), which initiated a civil investigation in late 2022 into the same conduct. The Office staffed the investigation with prosecutors in both the Oakland Branch and the Corporate and Securities Fraud section. In December 2023, Attorney 1, one of the attorneys representing IRL in connection with the SEC investigation, joined the Office and later became the Chief of the Corporate and Securities Fraud section. The Office recused Attorney 1 from the matter immediately, which was supervised instead by the Chief of the Oakland Branch. When Shafi's counsel at the time raised concerns about the appearance of a conflict based on Attorney 1's former representation of IRL, the Office took further steps to ensure impartiality. One prosecutor (AUSA 1 in Shafi's motion) was moved out of Attorney 1's section and no longer had any cases supervised by Attorney 1. Additionally, supervision of the case was removed from the Office entirely in August 2024; going forward the case was supervised by the Fraud Section (now the White Collar and Corporate Enforcement Section) of the Department of Justice's Criminal Division in Washington, D.C. In March 2025, Attorney 1 left the Office. In August 2025, following approval of the proposed charges by the Fraud Section, the Grand Jury returned an eight-count Indictment charging Shafi with wire fraud, securities fraud, and obstruction of justice.

These are the facts that Defendant Abraham Shafi claims amount to a conflict so severe that it requires the unprecedented step of dismissing the Indictment. He is wrong. To the extent there was even an appearance of conflict in this case, the significant steps the Office took were sufficient to put it to rest.[1] Fundamentally, Shafi cannot show that the investigation into his conduct and the ultimate decision to present charges to a Grand Jury was unfair or that the Office's representation violates any ethical rule. Attorney 1 played no role in the case on behalf of the government: Attorney 1 had no substantive

[1] Shafi does not argue the existence of an actual conflict as none of the facts support such a claim. His motion is predicated solely on the appearance of a conflict, which is what the government addresses herein.

involvement on the case upon joining the Office, she did not supervise the case, she did not review or approve the charges that were proposed seven months after she left the Office, and she had no influence over any of the prosecutors who conducted the investigation or presented the charges to the Grand Jury. Nor has Shafi demonstrated that members of the trial team would be unable to examine Attorney 1 at trial just because she is a former colleague. Shafi's request to dismiss the Indictment is unsupported by the facts and the law. It should be denied.

## BACKGROUND

### A. Abraham Shafi founded Get Together Inc., developer of the mobile app IRL, which raised $170 million in Series C investments.

In 2018, Abraham Shafi and his cofounder created Get Together Inc., a tech start up that developed and marketed IRL, a social media app whose vision was to connect online users "in real life"—"IRL," in internet slang—through in person interactions. In 2018, IRL raised an initial $8 million in funding including from Investor 2[2] and Investor 3 – both venture capital firms that then held seats on the Board of Directors. In 2020, Investor 2 led the Series B fundraise, which garnered another $16 million. In 2021, Shafi and IRL again solicited investors through a Series C fundraise from March to June of that year. The round was successful, yielding a significant $150,000,000 investment from Investor 1 and a further $20 million from Investor 2.

### B. After the SEC opened an investigation into whistleblower allegations that IRL was inflating its user metrics, IRL retained Attorney 1.

In mid-2022, things started to unravel for Shafi and IRL. Media reports based on information obtained from company insiders suggested that IRL's user figures were inflated and that the only individuals with full access to the true user data were Shafi's family members who were employed by IRL in key engineering positions.[3] Subsequent to these media reports, the SEC opened an investigation into whether IRL made false statements to investors regarding its user metrics. On August 22, 2022, the SEC issued a subpoena to IRL. Dkt. 64, Def.'s Mot. to Dismiss, Ex. A, SEC Subpoena. Shafi was not himself

---

[2] Investor 1 and Investor 2 as used herein correspond to the entities referenced in the Indictment. *See e.g.*, Dkt. 1, Indictment ¶¶ 6-7.

[3] Matousek, Mark and Efrati, Amir. "SoftBank-Backed Messaging App IRL Says It Has 20 Million Users. Some Employees Have Doubts About That" *The Information*. May 12, 2022, available at https://www.theinformation.com/articles/softbank-backed-messaging-app-irl-says-it-has-20-million-users-s ome-employees-have-doubts-about-that (last accessed Aug. 16, 2026).

subject to this initial subpoena, though he (along with several of his family members who also worked at IRL) were identified as "Specified Individuals" whose documents may be responsive to the requests. *Id.* at 5.[4] The subpoena required the production of various categories of documents for a period of January 1, 2020 through the present and asked for documents and communications related to bots or inauthentic user activity as well as how IRL measured or analyzed user activity metrics. *Id.* at 4, 8.

A few days later, IRL engaged Attorney 1, who was a partner at Firm 1, to represent it in connection with responding the SEC subpoena. Dkt. 64, Def.'s Mot. to Dismiss, Ex. B, Engagement Letter. Attorney 1 did not, however, represent Shafi, individually. *See id.* The engagement letter is clear that Firm 1's client was the company, IRL, and not any individual. *See id.* It does not appear that Shafi had individual counsel at this time.[5] IRL also engaged Firm 3, who had previously provided outside counsel services for IRL, to aid in its internal investigation and response to the SEC subpoenas. In October 2022, the SEC issued subpoenas to some of the "Specified Individuals" listed in the August 2022 SEC subpoena to IRL. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation at 4-5. Firm 1 represented one of those individuals. *Id.* at 5.

In November 2022, IRL hired a second law firm, Firm 2, to replace Firm 3 in responding to the SEC. Dkt. 64, Def.'s Mot. to Dismiss, Ex. C, Engagement Letter. Unlike Attorney 1 and Firm 1, Firm 2 *did* represent Shafi personally. *See id.* at 1, ¶ 1. Firm 2 also understood that Firm 1 represented the corporate entity IRL, and one of the "Specified Individuals" who was not Shafi. *Id.* Firm 2 agreed to represent the other "Specified Individuals" identified in the SEC subpoena. *Id.*

On November 10, 2022, the SEC issued a subpoena to Incent Ad Company 1,[6] a marketing firm specializing in incent advertising. Declaration of Sailaja M. Paidipaty ("Paidipaty Decl.") (filed concurrently with this briefing), Exhibit 1, November 2022 SEC subpoena. The subpoena requested documents concerning Incent Ad Company 1's interactions and communications with both IRL and Entity

[4] This page references for Exhibit A correspond to the page number of the overall PDF, which is one file combining a cover letter and subpoena.

[5] Shafi asserts that "Attorney 1 advised Shafi in his capacity as IRL's CEO" but does not cite to anything in the record supporting the assertion. *See* Dkt. 64, Def.'s Mot. to Dismiss at 3.

[6] Incent Ad Company 1 as used herein corresponds to an entity referenced in the Indictment. *See e.g.*, Dkt. 1, Indictment ¶ 8.

2, a company used by IRL to place incent ads on IRL's behalf. *Id.* at 7.

On December 19, 2022, the SEC issued subpoenas directly to Shafi and five other IRL employees, four of whom were his family members. Paidipaty Decl., Exhibit 2, December 2022 SEC subpoena. *See also* Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation at 4. The Subpoena expanded the scope of the SEC's inquiry; in addition to topics related to the bots allegations, the SEC requested documents concerning "IRL's classification of operating expenses in sub-line items (such as team/personnel/people, infrastructure, PR/marking/growth, etc.)" *Id.* at 10. The SEC specified that responsive materials include documents related to "how IRL classified payments made to Entity 2 and Entity 1.[7] *Id.* It appears that Firm 2 represented Shafi and each of these individuals in connection with their personal SEC subpoena responses. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. C, Engagement Letter; *see also* Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation at 4.

By December 2022, the SEC's investigation had therefore expanded beyond the original allegations regarding bots and inauthentic users, turning also to allegations of misconduct relating to IRL's representation of its marketing spending. The record reveals that, by December 2022, the SEC had already honed in on Entity 1, the relationship between IRL and Incent Ad Company 1, and incent advertising as core issues.

### C. IRL and its attorney's conducted an internal investigation into the SEC allegations.

The government is not privy to most of the steps taken by Attorney 1 and Firm 2 in the course of their representation of IRL, which are generally covered by attorney-client privilege. The government understands from documents provided by IRL, that Attorney 1 and Firm 2 engaged in an internal investigation to understand the facts and respond to the SEC allegations and subpoenas. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. S, Keystone Report; Ex. U, June 23, 2023 IRL Board Minutes and Resolution. The government also understands that Attorney 1 assisted with the production of documents to the SEC, and had numerous conversations with the attorneys for the SEC. Paidipaty Decl. ¶ 5.

The government is also aware that following concerns from the SEC regarding potentially deleted data responsive to the SEC subpoena, between November 2022 and April 2023, lawyers working on the

[7] Entity 1 as used herein corresponds to an entity referenced in the indictment. *See e.g.*, Dkt. 1, indictment ¶ 10.

IRL internal investigation attempted to image phones belonging to Shafi, as well two of his cousins, his brother, and his sister.. *See* Dkt. 1, Indictment ¶ 32; *see also* Dkt. 64, Def.'s Mot. to Dismiss, Ex. E. January 2023 Presentation at 57-68. The government does not know Attorney 1's role in the collection of the devices. The Board hired a consultant to conduct a forensic analysis of these devices. Paidipaty Decl., Ex. 4, Stroz Forensic Report. The analysis concluded that prior to the date that the Board had the phones imaged, all but Shafi's sister had restored their phones to a backup from a prior point in time.[8] *See id.*

Evidence was also uncovered about potential accounting errors in the description of payments to Entity 1 in IRL's books and records. In response to this, on September 28, 2022, Shafi wrote to the Board of Directors representative from Investor 1, regarding the error. *See* Dkt. 1, Indictment ¶ 27. He characterized the problem as a categorization issue: the company had put most of its paid advertising spend under "Infrastructure" but it should have been in "Growth" of the profit/loss statement. *Id.* Shafi reassured Investor 1, though, that overall expenditures remained the same, it was merely that line items were shifting from one bucket to another. *Id.* Shafi later told the Board representative from Investor 1 that the paid acquisition spend had been characterized under "Infrastructure" because the majority of it was spent on SMS ads, which require extensive bandwidth to support. *Id.* This was false. Even while under investigation by the SEC, Shafi lied about the nature of this spending.

### D. In January 2023, IRL's Board of Directors appointed a Special Committee to continue the internal investigation, which retained Attorney 1 as its counsel.

In January 2023, Firm 2 presented the preliminary results of its internal investigation to the Board of Directors. The presentation covered five "Key Issues Identified by the SEC:" 1) "Active User Reporting, Fake Users and Bots;" 2) "Expense Classifications," specifically whether "infrastructure and growth expenses" were misclassified and whether there was intent to defraud; 3) Deletion of a "Jira Ticket" regarding "Creation of Bot Accounts;" and 4) "Employee Complaints" of whistleblower

[8] Restoring a phone deletes all current data and content, including data, settings, contacts, messages, etc. and will restore all settings to a previous backup that had been previously saved elsewhere, such as a cloud storage space. The physical device, then, only retains information from that backup. For example, if in January 2023 a user restored their device to a backup from January 2022, the device would then only contain data through January 2022 and would not retain any data that may have previously been on the phone post-dating January 2022.

retaliation. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation.

On the question of IRL's use of bots, the presentation noted that Cloudflare (a tool used by IRL to detect bot activity) reported only 3% human traffic in July of 2022, but by 2023, reported 87% human traffic. *Id.* at 17. The presentation went on to say that while "it is too early to tell this with certainty" there was an initial impression "that Cloudflare's data has only limited utility for spotting bots on IRL."[9] The presentation goes on to cover numerous internal communications at IRL on the topic of Monthly Active Users and bots. *See id.* The Board was not, however, told that the bot allegations were false.

The presentation next covered a topic it called "Related Party Transactions," which included payments made to Entity 1, a company run by Individual 1 before and after he became an IRL employee. *Id.* at 40-43. This section included Individual 1's "conduct in mischaracterizing expenses" and asked "whether [Individual 1] created false invoices to create the impression that IRL had higher infrastructure costs rather than growth expenses." *Id.* at 40. The Board was shown numerous communications reflecting $2,000,000 invoices that IRL paid to Entity 1. *Id.* at 42. The Board was not told that these payments were made for incent ads.

From there, the next topic covered "Expense Classification," and included questions about IRL and Shafi's representations of certain expenses as "growth" or "infrastructure" and Shafi's representation to investors that its growth was "organic." *Id.* at 44-56. The Board was informed of Shafi's representations that ads spend was "~50k" which he said was "incredible[*sic*] minimal." *Id.* at 46. The Board was also shown communications from Shafi to a client services manager at Incent Ad Company 1 from April 2021 discussing invoices of nearly $500,000 for advertising, and another communication from Individual 1 noting that advertising spend in July 2022 would be over $1 million. *Id.* at 48-49. The Board saw a communication where Shafi ordered Individual 1 to create a fake invoice and coached him on how

---

[9] The government understands that over the course of its internal investigation, IRL engaged two expert consultants to evaluate the allegation that a large proportion of IRL's users were automated bots. Firm 3 proposed engaging Keystone Strategy to evaluate the bots issue. See Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation at 19-20. In December 2022, after Firm 2 replaced Firm 3, it engaged Celerity Consulting Group to conduct a similar analysis. See *id*. . The January 2023 presentation suggests that Celerity's analysis was not yet completed at the time of the presentation. The government ultimately received the completed Celerity analysis from Shafi's prior counsel. Paidipaty Decl., Ex. 3, Celerity Report. The analysis assessed the efficacy of Cloudflare as a tool to identify bot accounts; it did not undertake an independent evaluation of IRLs user data to determine what percentage constituted automated traffic.

to cover up the fraud. *Id.* at 54-55. But in all of this, the Board was never informed that the majority of the ad spending was on incent ads, rather than the SMS ads that Shafi had claimed it was for.

After covering the remaining topics, the presentation summarized updates from the SEC. These included the SEC's concerns regarding the payments to Entity 1 and a request for further investigation on this point. *Id.* at 76.

A few days later, the Board responded to this presentation by appointing a special committee of independent board members to carry the internal investigation forward. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. F, January 25, 2022 Board Minutes. The members of the Special Committee included the outside directors. *Id.* They were to have all the powers of the Board as it related to the investigation. *Id.* To assist its investigation, the Special Committee retained Attorney 1 from Firm 1 who at that point terminated her previous representation of IRL. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. I, March 20, 2023 Email. Since the Board had appointed the Special Committee to carry the investigation forward, Attorney 1 apparently informed Firm 2 that she would handle further communications with the SEC. *Id.*

**E. The United States Attorney's Office opened a criminal investigation into IRL and Shafi.**

On or about April 10, 2023, the Office opened a criminal investigation into the same conduct being investigated by the SEC: allegations that IRL's user metrics were falsified, as well as allegations that of fraud in connection with IRL's marketing spending. Paidipaty Decl. ¶ 2. By that point, the SEC had already taken numerous depositions and questioned witnesses extensively on incent ads, the issue ultimately at the heart of the criminal Indictment. Paidipaty Decl. ¶ 3.

The Office co-staffed the investigation with AUSAs assigned to both the Oakland Branch Office (though a mostly remote company, IRLs corporate address was in Berkeley) and the Corporate and Securities Fraud section. *Id.* But supervision of the investigation rested with the Oakland Branch Chief. *Id.*

In July 2023, a few months after opening the investigation, the government sought and obtained a search warrant authorizing a search of Shafi and his home in Hawaii. Paidipaty Decl., Ex. 4, In the Matter of the Search of Property in Hawaii, Mag No. 23-1091 KJM. The listed offenses of investigation included wire fraud and obstruction of justice. *Id.* The affidavit supporting the application for the warrant noted

that the "FBI is investigating . . . potential misrepresentations made by Shafi and others at IRL in conjunction with rounds of fundraising" including "statements regarding the Company's user acquisition chancels and the amount of money that the company spent on advertising and marketing." *Id.* ¶ 29. The warrant went on to outline that the FBI was investigation Shafi's use of incent advertising and his misrepresentation about that advertising to potential investors. *Id.* ¶ 30. The affiant described reviewing numerous communications from Shafi to incent advertisers in which he spent significant amounts of money on incent ads. *Id.* ¶¶ 30-33. The affiant also described Shafi's misrepresentations to investors, including the claim that IRL spent "50k" on user acquisition. *Id.* ¶ 25. Finally, the affiant described evidence suggesting that Shafi had restored his phone to a previous backup file in order to delete responsive data. *Id.* ¶ 58. The warrant authorized the seizure of various categories of information, including "communications with, or concerning Incent Ad Company 1, Incent Ad Company 2, or other incent advertising firms" and "records . . . concerning altering, tampering with, or destroying evidence." *Id.* at Attachment B.

The investigative team did not contact counsel for IRL, including Attorney 1, until after the execution of the warrant. Paidipaty Decl. ¶ 4. After that date, and in the course of the investigation, the investigative team reached out to counsel for IRL, including Attorney 1, who provided information on the procedural posture of the civil investigation, produced documents, and helped coordinate witness interviews. Paidipaty Decl. ¶ 5.

By July 2023, before ever contacting counsel for IRL or Attorney 1, the government had therefore already collected substantial evidence demonstrating that Shafi had misrepresented IRL's marketing spend and user acquisition channels to investors, and that he had obstructed justice by restoring his phone to a previous backup. These allegations would later form the heart of the eight-count criminal indictment.

### F. The Special Committee's investigation revealed misconduct by Shafi, who was then terminated as CEO.

One of the issues that the Special Committee investigated was Shafi's use of his corporate credit card for millions of dollars in personal expenses. By April 2023, the Board learned that Shafi had spent $2 million in IRL funds on personal expenses and had paid back approximately $1 million to IRL. Dkt. 1,

Indictment ¶¶ 28-29. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. X, June 20, 2023 Board Minutes.[10] The most egregious example of Shafi's continued personal spending with IRL funds involved Shafi's April 2022 wedding. Dkt. 1, Indictment ¶¶ 28-29. When the Special Committee learned about this misconduct in April 2023, they voted to terminate Shafi as CEO. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. X, June 20, 2023 Board Minutes.

The Special Committee also continued to investigate the bots issue. In May 2023, it engaged Keystone Strategy to conduct a forensic review of IRL's historic user data. The IRL Board initially approached Keystone in the fall of 2022, but ultimately retained Celerity instead. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation at 19. Keystone issued its report in June 2023. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. S, Keystone Report. The main findings of the Keystone Report were (1) a significant portion (over 95%) of historical active users on the platform after June 2022 were likely bot accounts and (2) based on data pulled from IRL's investor dashboard, daily active users plummeted from approximately 2.5 million at the end of April 2023 (when Shafi was fired as CEO) to approximately 1 million by May 11, 2023 and remained under 150,000 daily active users from May 14, 2023 until the publishing of the report in late-June 2023. *Id.*

### G. In June 2023, the Special Committee presented to the Board on the findings of its investigation, which then voted to dissolve the company.

On June 20, 2023, Attorney 1 made a presentation to the Board in which she summarized the results of the Special Committee's internal investigation. Dkt. 64, Def.'s Mot. to Dismiss, Ex. X, June 20, 2023 Board Minutes. Attorney 1 reviewed the findings of the Keystone report, including that as of May 2022, 95% of the Company's users were likely bots. *Id.* She also covered evidence that Shafi lied to investors regarding its marketing spend and user acquisition costs and that Shafi spent more than $2 million in unreimbursed personal charges on his company credit card. *Id.* On June 23, 2023, the Board held a further meeting. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. W, June 23, 2023 Board Minutes. At this meeting, the Board voted to remove Shafi as a director. *Id.* The Board, believing that the vast majority

[10] *See also* Matousek, Mark, "IRL Suspended CEO Shafi After Reported Pattern of Misconduct; Acting CEO Named." *The Information,* Apr. 30, 2023, available at https://www.theinformation.com/articles/irl-suspended-ceo-shafi-after-reported-pattern-of-misconduct-acting-ceo-named (last accessed Aug. 16, 2026).

of the users were bots, also voted to dissolve the company. *Id.*

**H. In September 2023, Attorney 1 sent a letter to the SEC, responding to its request for IRL's view on whether the SEC should pursue a civil case against IRL.**

At some point, the SEC requested that IRL provide its view on whether it should be charged in connection with "Mr. Shafi's misrepresentations to Series C investors regarding advertising and marketing expenses and his use of investor proceeds for personal expenses." Dkt. 64, Def.'s Mot. to Dismiss, Ex. J, September 2023 Letter to SEC at 1. On September 29, 2023, Attorney 1 sent a letter to the SEC (and the SEC alone) explaining why Get Together, Inc. should not be charged. *Id.* Attorney 1 made several arguments. First, she informed the SEC that the company had dissolved and was now defunct, and so would never again violate securities laws. *Id.* at 1-2. Second, she highlighted IRL's cooperation with the SEC, including the creation of the Special Committee, the suspension of Shafi and two family members after learning about their role in the misconduct, briefing provided to the SEC regarding Shafi's conduct, the waiver of privilege over key documents, and the facilitation of SEC witness interviews. *Id.* at 2-5.

Attorney 1 also recommended that the SEC "coordinate" its civil investigation with the DOJ's investigation into the same set of facts. Attorney 1 said that IRL would continue to cooperate with both investigations. *Id.* at 6-7. She did not recommend that Shafi or anyone else be criminally charged. *Id.* The Office did not receive a copy of Attorney 1's letter until it reviewed the exhibits Shafi submitted in connection with this motion.

**I. In December 2023, Attorney 1 joined the United States Attorney's Office, which took several actions to mitigate any appearance of a conflict of interest.**

In December 2023, Attorney 1 joined the United States Attorney's Office for the Northern District of California as an Assistant United States Attorney, and the following month became Chief of the Corporate and Securities Fraud Section. Paidipaty Decl. ¶ 6. Attorney 1 did not supervise the investigation into Abraham Shafi. The investigation was supervised by the Chief of the Oakland Branch. *Id.* ¶ 2. Attorney 1 did initially supervise AUSA 1, one of the AUSAs on the investigative team, who at the time was assigned to the Corporate and Securities Fraud Section. *See Id.* ¶ 2, 6. But AUSA 1 never discussed the substance of the investigation with Attorney 1. *Id.* ¶ 9.

The government has identified three relevant communications that Attorney 1 sent regarding the

IRL investigation.[11] First, on January 3, 2024, Attorney 1 forwarded a link to a Financial Times article concerning IRL to the IRL case team. Paidipaty Decl., Ex. 6, Jan. 3, 2024 Email. There was no commentary other than that it appeared to be about IRL; however Attorney 1 could not access the full article because of a paywall. *Id.* AUSA 1, in response, attached the full publicly available article. *Id.* The response did not include any substantive discussion of IRL or the Office's investigation. *Id.* In February 2024, Attorney 1 sent an email to the Chief of the Oakland Branch, in which she asked whether another AUSA in the Corporate Securities Fraud section should be assigned to the IRL investigation in order to "move it along." Paidipaty Decl., Ex. 7, February 20-21, 2024 Email. The communication did not concern the substance of the case, and the Chief of the Oakland Branch responded by telling her that she should not be discussing the matter. *Id.* In a subsequent email, the Chief of the Oakland Branch explained that while Attorney 1 could have limited discussions on staffing and bandwidth of AUSAs in Corporate and Securities Fraud working on matters from which she was recused, she could not have substantive discussions and it was imperative that the Office avoid any appearance of a conflict of interest. *Id.* Attorney 1 was recused from the matter from the date she joined the Office, and remained recused for her entire tenure. Finally, the government identified one additional email in which Attorney 1 asked for the name of the case agent assigned to the IRL investigation. Paidipaty Decl., Ex. 8, January 8, 2024 Email.

On May 14, 2024, then-counsel for Abraham Shafi sent a letter to the Office expressing concern that recusal of Attorney 1 might not be "sufficient to guard against conflict of interest and appearance of impartiality concerns," and asking if instead recusal of the entire Office was required. *See* Dkt. 64, Def.'s Mot. to Dismiss, Ex. O, May 16, 2024 Letter. The concern raised was stated as follows: "For a jury to hear from a government witness who both previously investigated Mr. Shafi and currently supervises the AUSAs prosecuting Mr. Shafi would raise questions about the appearance of impartiality and put the Office in the untenable position of having a stake in advancing the interests of a particular witness." *Id.* at 4.

In response to this letter, the Office took further steps to mitigate any potential appearance of

[11] In producing these documents, the government is not waiving any applicable privileges it could assert over other internal records and communications.

impropriety. Dkt. 64, Def.'s Mot. to Dismiss, Ex. P, Aug. 18, 2024 Letter. First, AUSA 1, the only member of the investigative team supervised by Attorney 1, was moved to a different section, and so removed from Attorney 1's supervision entirely. *Id.*; Paidipaty Decl. ¶ 7. Second, supervision of the entire matter was moved from the Oakland Branch, and from the Office entirely, to the Fraud Section of the Department of Justice Criminal Division. *Id.* Finally, an attorney sitting in and supervised by the Fraud Section was brought onto the prosecution team. *Id.*

### J. In March 2025, Attorney 1 left the United States Attorney's Office; in August 2025, the grand jury charged Shafi with fraud and obstruction of justice.

In March 2025, Attorney 1 left the United States Attorney's Office. Paidipaty Decl. ¶ 7. During her time at the office, Attorney 1 never supervised the investigation into Shafi, the investigative team never had substantive conversations with her regarding the case, and ultimate charges were filed months after Attorney 1 left the Office.

The government presented this case to the Grand Jury in August 2025, which resulted in the return of an eight-count indictment. Those charges were reviewed and approved by management of the Fraud Section. Paidipaty Decl. ¶ 10.

## LEGAL STANDARDS

### A. Recusal of United States Attorney's Offices

The Ninth Circuit recently held that disqualifying "an entire office of an Executive Branch attorney" represents a "sweeping interference" with another branch of government which is "seldom warranted." *United States v. Williams*, 68 F.4th 564, 572 (9th Cir. 2023); *see also United States v. Bolden,* 353 F.3d 870, 878-9 (10th Cir. 2003) (holding that "the disqualification of Government counsel is a "drastic measure and a court should hesitate to impose it except where necessary."). Even the lesser interference of "[d]isqualification of a single prosecutor has been ordered" only "in limited circumstances, such as when the prosecutor would be a witness at trial . . . or has an actual conflict of interests[.]" *United States v. Thanh Viet Cao*, 526 F. App'x 798, 800 (9th Cir. 2013) (citing see *United States v. Prantil*, 764 F.2d 548, 552–53 (9th Cir.1985) and *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809 (1987)).

In *Williams*, the Ninth Circuit explained that "[b]ased on separation-of-powers principles and the

consensus among courts . . . disqualification of an entire U.S. Attorney's Office is an extreme remedy—only appropriate in the most extraordinary circumstances." 68 F.4th at 573. Indeed, "[d]isqualification of an entire United States Attorney's Office is nearly unprecedented." *United States v. Manna,* Nos. CR 88–0239 DRD, CIV 97–2034 DRD, 2006 WL 3063456, at *8 (D.N.J. Oct. 25, 2006) (citing *United States v. Whitaker*, 268 F.3d 185 (3d Cir. 2001)). "[E]very circuit court that has considered the disqualification of an entire United States Attorney's office," including the Ninth Circuit, "has reversed the disqualification." *Williams*, 68 F.4th at 573 (referencing *Bolden,* 353 F.3d at 879; *Whittaker,* 268 F.3d 185; *United States v. Vlahos,* 33 F.3d 758 (7th Cir.1994); *United States v. Caggiano,* 660 F.2d 184 (6th Cir.1981)).

*Williams* announced a two-part test for disqualifying an entire United States Attorney's Office: "First, a district court must find a strong factual predicate for blanket disqualification. Second, a district court must determine that the U.S. Attorney's Office's continued representation of the government will result in a legal or ethical violation." 68 F.4th at 573. The court's finding must include a determination that "any misconduct or conflict so pervades the office that less intrusive remedies would be inadequate to safeguard against a legal violation." *Id.* The Ninth Circuit emphasized that it will only "thwart the will" of the Executive branch when its "behavior is not in accordance with law." *Id.* (internal citations omitted).

"Whether an entire United States Attorney's Office should be disqualified is a question to be determined on a case-by-case basis by analyzing the requirements of the California Rules of Professional Conduct, the American Bar Association ("ABA") Model Rules of Professional Conduct, and state and federal cases." *United States v. Nosal*, No. C 08-00237 MHP, 2009 WL 482236, at *2 (N.D. Cal. Feb. 25, 2009). In general, "[t]here is no controlling standard in the Ninth Circuit for imputation of a conflict where a private defense attorney joins a prosecutors' office." *Id.* But "Ninth Circuit authority has refused to extend cases that apply the imputed disqualification rule to private law firms equally to government agencies." *Id.* (citing *Matter of Grand Jury Investigation of Targets,* 918 F.Supp. 1374, 1378 n. 11 (S.D.Cal.1996) (noting that the imputed disqualification rule assumes that the client can hire another law firm, whereas in the case of government agencies, "the only choices for federal prosecution are the local AUSAs, Department of Justice attorneys, or special prosecutors.")).

The Ninth Circuit explained that "the generally accepted remedy," for a conflict of interest "is to disqualify a specific Assistant United States Attorney, not all the attorneys in the office." *Williams*, 68 F.4th at 574 (citing *Bolden,* 353 F.3d at 879); *see also, Nosal*, 2009 WL 482236, at *4; *United States v. Rodella*, 59 F. Supp. 3d 1331, 1348–49 (D.N.M. 2014).

**B. Dismissal of an indictment**

"A district court may dismiss an indictment under its inherent supervisory powers (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (internal quotations omitted). "Dismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice." *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993); *accord United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir. 2004). Dismissing an indictment is a "drastic remedy" and it is "disfavored." *Ross*, 372 F.3d. at 1110 (citing *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988)). A district court may dismiss an indictment as an "appropriate sanction for a constitutional violation only where less drastic alternatives are not available." *Kearns*, 5 F.3d at 1254. The government is aware of no case, and the defendant cites no case, where an indictment was dismissed because of an alleged conflict of interest, either actual or apparent.

**ARGUMENT**

Shafi claims that the indictment must be dismissed because Attorney 1 at one point represented IRL and the IRL special committee, and at another point worked for the United States Attorney's Office for the Northern District of California. But Shafi has not pointed to one ethical principle that would be violated by the Office's continued representation. And that is because there is no ethical violation. Attorney 1 had no role in the case after joining the Office. She never shared any confidential information with any member of the case team. She did not supervise the case or review any proposed charges. And she left the Office months before charges were approved by the Fraud Section and presented to the Grand Jury. At every step the Office has acted in accordance with its ethical duties and will continue to do so. Shafi has pointed to no facts that would warrant the extreme measure of recusing the entire Office, much less the truly unprecedented action of dismissing the indictment. His motion must be denied.

//

**A. There Is No Basis For The Recusal Of The United States Attorney's Office**

There is no basis to recuse the Office. Shafi makes two arguments for why there is a conflict that requires at least recusal. First, he argues that Attorney 1's senior role at the Office "influenced the prosecutors" who unavoidably "credited their leader's work." Dkt. 64, Def.'s Mot. to Dismiss at 19. Second, he argues that Attorney 1 will be a critical fact witness, and "the public could reasonably question Attorney-1's credibility if Shafi calls her, precisely because her former subordinates sit at the prosecution table." *Id.* at 16. But Shafi has shown neither a strong factual predicate for officewide recusal, nor that the continued involvement of this Office will "result in a legal or ethical violation." *Williams*, 68 F.4th at 573.

**1. There is no factual basis to disqualify the entire Office.**

Shafi must show a "strong factual predicate for blanket disqualification." *Williams*, 68 F.4th at 573. For the reasons outlined below, even if Shafi's narrative was taken as true, there would be no legal basis for recusing the entire Office. But Shafi's narrative *is not true*; it is rather riddled with serious factual errors. Correcting these errors drastically changes the story and destroys Shafi's claim that he was prejudiced by Attorney 1's employment by the Office. *Id.* (explaining that "defendants must demonstrate prejudice from a prosecutor's potential conflict of interest or present clear and convincing evidence of prosecutorial misconduct before a district court may disqualify a prosecutor") (cleaned up).

Shafi alleges that Attorney 1 became chief of "the same Section that had been investigating Shafi and IRL, and the same Section with which she had been 'cooperating' on the company's behalf." Wrong. The Corporate and Security Fraud section was not the section responsible for investigating Shafi. The case was opened by, and prior to April 2024 supervised by, the Oakland Branch of the Office. Paidipaty Decl. ¶ 2. While one member of the case team was assigned to the Corporate and Securities Fraud section, the other two members, including the supervisor, were assigned to the Oakland Branch. And after Shafi complained about Attorney 1's presence at the Office, the sole member of the investigative team who had been in the Corporate and Securities Fraud section was moved to another section. Dkt. 64, Def.'s Mot. to Dismiss, Ex. P, Aug. 18, 2024 Letter; Paidipaty Decl. ¶ 7. Attorney 1 never supervised the investigation,

never supervised the section that conducted the investigation, and other than the first few months in the Office, did not even supervise any member of the investigative team.

Shafi goes on to allege that Attorney 1 "handed the government its theory" of the case. Dkt. 64, Def.'s Mot. to Dismiss at 13. Wrong. The basis for this claim is a letter that Attorney 1 sent *to the SEC,* asking that it not charge IRL. *See id.* at Ex. J, September 2023 Letter. While the letter suggested that the SEC coordinate with DOJ, it did not recommend any charges. *See id.* at 6-7. Nor was it addressed or copied to DOJ, and nobody at DOJ, including the case team, received the letter until the filing of this motion. Most importantly, this letter did not provide the SEC with any new information. By the date of the letter, the SEC had been conducting its investigation for over a year.[12] The face of the letter demonstrates the absurdity of Shafi's claim that Attorney 1 "handed the government its theory:" the letter is a response to the SEC's consideration of charges against IRL relating "to Mr. Shafi's misrepresentations to Series C investors regarding advertising and marketing expenses and his use of investor proceeds for personal expenses." *Id.* at 1. In other words, the letter demonstrates that the SEC already had a clear theory of Shafi's liability; the open question was whether the SEC should "impute Mr. Shafi's conduct to IRL." *Id.*

Other facts further belie Shafi's claim that Attorney 1 masterminded the theory of fraud underlying this case. The SEC's second round of subpoenas, sent to Incent Ad Company 1 in November 2022 and Shafi and his family members in December 2022, had already expanded to include topics related to IRL's growth spending. Paidipaty Decl., Ex. 1, Subpoena to Incent Ad Company 1; Dkt. 64, Def.'s Mot. to Dismiss, Ex. E, January 2023 Presentation at 4. This was months before Attorney 1 had been appointed to represent the Special Committee. Shafi provides no evidence that Attorney 1 somehow led the SEC to this theory as early as November 2022. Nor could he: the SEC's suspicion that Shafi had misled investors about its marketing spend was based on its own investigation. Similarly, in July 2023, the government executed a search warrant on Shafi's residence. *See* Paidipaty Decl., Ex. 5, Hawaii Warrant. The warrant affidavit included detailed allegations that Shafi had misled investors in order to conceal the millions of

[12] In fact, had the letter been received by the DOJ, it also would not have provided the DOJ with any new information, given that by September 2023 the DOJ had established probable cause of Shafi's scheme to defraud investors and executed a search warrant on Shafi's property.

dollars he was spending on incent advertising. Indeed, nearly all of the core allegations that would eventually make up the indictment in this case were contained in the affidavit supporting the July 2023 warrant. Since the warrant was obtained, and the search executed, before the government had engaged IRL and its attorneys, including Attorney 1, it is impossible that Attorney 1 could have "handed" the government theory of the case. This assertion is simply untrue.

Finally, Shafi alleges that Attorney 1 "was running the Section that ultimately" charged Shafi. Wrong. Attorney 1 never supervised the section that charged Shafi, and indeed, by the time the case was charged, had left the Office, and so did not supervise *any* section. As explained above, when Attorney 1 joined the Office, the case was supervised by the Oakland Branch. After Shafi's counsel complained about Attorney 1's presence at the Office, supervision for the case was removed from the Office entirely. The charges were ultimately reviewed and approved by the Criminal Division's Fraud Section. And these charges were reviewed, approved, and presented to the Grand Jury *months after* Attorney 1 had left the office.

The true story is very different from what Shafi describes. Attorney 1 represented Shafi's victim and cooperated with government attorneys, facilitating interviews and providing documents. But she did not cause the criminal investigation to be opened, nor did she provide the theory of the case. Attorney 1 later joined the office and took over the Corporate and Securities Fraud section. But she was recused from this matter and had no involvement. She did not supervise the case. Other than a few months at the beginning of her tenure with the Office, she did not supervise any member of the case team. She did not share any evidence or confidential information with the case team. She did not review charges. She did not approve charges. To the extent that there could have been any prejudice to the defendant from Attorney 1 joining the office, the steps the Office took—recusing Attorney 1, moving AUSA 1 out of her section, and moving supervision to the Fraud Section—completely alleviated it. Nothing in this record is an "extraordinary circumstance[]" warranting the "extreme remedy" of recusing an entire Office. *Williams*, 68 F.4th at 573

### 2. The Office's continued representation will not violate any law or ethical duty.

Without showing a strong factual predicate for disqualification, Shafi's motion must fail. *Williams*, 68 F.4th at 573. But even if the Court were to find such a factual predicate, Shafi must also

show that the Office's continued representation "will result in a legal or ethical violation." *Williams*, 68 F.4th at 573. He has not done so. There is no ethical rule or legal authority that requires the Office to recuse in this situation. Shafi nevertheless advances three primary theories for why the Office must recuse: 1) that Attorney 1's conflict is imputed to the Office or otherwise creates the appearance of partiality; 2) that Attorney 1's position as a supervisor requires recusal; and 3) that Attorney 1 may be a witness at trial. Each of these arguments is unsupported by law and must be rejected.

**3. There is no ethical rule that requires recusal of the Office.**

Shafi has identified no ethical rule or legal principle that would be violated by the Office's continued participation in this case and has therefore failed to make the showing necessary for recusal of the entire Office. *Williams*, 68 F.4th at 573.

Shafi only cites one ethical standard—Model Rule of Professional Conduct 3.8—in support of his argument that the Office must be recused. Model Rule 3.8 covers the "Special Responsibilities of a Prosecutor," and has been adopted in California as California Rule of Professional Responsibility 3.8. The Rule has numerous requirements, including that no prosecutor pursue a case that they know is not supported by probable cause, make reasonable efforts to ensure defendants are advised of their rights, respect the rights of unrepresented parties, make required disclosures of discovery, including exculpatory evidence, and seek to remedy wrongful convictions. Shafi does not point to any provision of the Rule itself that he believes has been violated. Rather, he points to a provision of the commentary to the rule, which states that "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Dkt. 64, Def.'s Mot. to Dismiss at 11 (quoting commentary to Model Rule of Professional Conduct 3.8). This is of course a correct statement of the role of a prosecutor. But Shafi must do more than recite this truism. In order to obtain the extraordinary remedy of recusal, he must show that the Office's participation would result in an actual violation of an ethical rule.

Shafi's suggestion seems to be that the ethical violation is simply the appearance that the Office would not be impartial. But the "Ninth Circuit has made clear the appearance of impartiality is insufficient grounds for prosecutorial disqualification." *Nosal*, 2009 WL 482236, at *3. "[A]n appearance of impropriety [is] insufficient and the appropriate standard requires a showing of actual prejudice to disqualify a USAO." *Id.* (citing *United States v. Lorenzo,* 995 F.2d 1448 (9th Cir.1993) (holding that

there was no prejudice where there was no suggestion that the charges were brought because of the victimization of the U.S. Attorney himself; and no suggestion that the USAO "did not exercise its discretionary function in an even-handed manner or that its zeal was not born of objective and impartial consideration of the merits of this case.")). There is no basis for "disqualifying the entire USAO, when no evidence of confidential information sharing occurred and appropriate screening steps were taken;" rather, recusal is a remedy reserved for "serious abuses." *Id.*

To the extent that Shafi's motion is based on a belief that an ethical violation would occur because Attorney 1's conflict can be imputed to the office, this argument also fails. Unlike private law firms, the conflicts of individual prosecutors are not imputed to the entire prosecutor's office. *See Matter of Grand Jury Investigation of Targets,* 918 F. Supp. at 1378; *see also Nosal*, 2009 WL 482236, at *2 (noting that under the Model Rules of Professional Conduct, "personal conflicts are not imputed to others in a government office"); *United States v. Glob. One Grp., LLC*, No. 3:08-CR-0120-LRH-VPC, 2010 WL 3259915, at *2 (D. Nev. Aug. 16, 2010) (explaining that "there is no requirement that the court recuse an AUSA or a USAO based on the imputed conflict"). This principal stems from the Ninth Circuit's conclusion that government agencies are not like private law firms. *See United States v. Weiner,* 578 F.2d 757, 767 (9th Cir.), cert. denied, 439 U.S. 981(1978) (noting that the free flow of information assumed to exist within law firms is not assumed for government agencies)*; In re Charles Willie L.,* 63 Cal.App.3d 760, 765, 132 Cal.Rptr. 840 (1976) ("Any analogy between a private law firm and the district attorney's office is tenuous at best"). The principle is consistent with the Ninth Circuit's reasoning for imputing conflicts in the case of private law firms, in which case the client is free to hire another law firm. *See Trone v. Smith,* 621 F.2d 994 (9th Cir.1980). Finally, there are separation of powers concerns when the judiciary disqualifies a government agency which are not present in the case of private law firms. *See Rodella*, 59 F. Supp. 3d at 1348–49 (noting that there "disqualifying government attorneys implicates separation of powers issues . . .").

Unsurprisingly, then, the Ninth Circuit has previously refused to disqualify an entire office on the basis of a single attorney's conflict, a result that is only possible if it is not imputing the attorney's conflicts to the entire office. *See, e.g., United States v. Mapelli,* 971 F.2d 284, 287-8 (9th Cir.1992) (holding that two AUSA must be disqualified after being exposed to immunized testimony without recusing the entire

office).

Unaided by the ethical rules, Shafi tries to support his argument by citing to the DOJ Justice Manual, which he argues "does not confine recusal to individual attorneys." Dkt. 64, Def.'s Mot. to Dismiss at 11. Shafi argues that "Section 3- 1.140, which addresses recusal of a U.S. Attorney's Office, provides that the 'requirement of recusal' arises where 'a conflict of interest exists or there is an appearance of a loss of impartiality.'" *Id.* But the Ninth Circuit has recognized that "the U.S. Attorneys' Manual is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal" and therefore does not provide a legal basis for a Court to recuse a United States Attorney's Office. *Lorenzo*, 995 F.2d at 1453 (internal quotations omitted).

Furthermore, nothing about the facts of this case suggests that continued participation of the Office could result in an appearance of a loss of impartiality. Here, an attorney joined the Office, was immediately recused, and never supervised the case. The AUSA in the section she supervised was moved to a different section and supervisory chain after Shafi raised the potential conflict. Another office of the DOJ was brought in to supervise the case and approve charges. And the attorney at issue left the Office almost six months before charges were actually presented to the Grand Jury.

None of the communications between Attorney 1 and the case team change this conclusion. Attorney 1 reached out to the Oakland Branch Chief supervising the matter asking whether another AUSA would help move the case along. This communication cannot have had any impact on the prosecution. No confidential information was shared. No new staffing was added to the case. And the supervisor refused to discuss the case with Attorney 1, noting the importance of avoiding even the appearance of a conflict. Nor could Attorney 1 have had any untoward influence over the Oakland Branch Chief, since she did not supervise him or have any control over his career. *See United States v. Minkkinen*, No. 2:22-CR-00163, 2023 WL 3587757, at *5 (S.D.W. Va. May 22, 2023) (recusing every AUSA in an office when the United States Attorney was conflicted and would be a trial witness, finding that the subordinate attorney's "ability to fairly evaluate evidence from his boss could reasonably be questioned"). The same is true with respect to the other communications identified by the government: no confidential information was shared, no case strategy was discussed, and nothing suggests any prejudice at all to Shafi. In short,

nothing about these facts suggest an appearance of partiality; in fact, the diligence displayed by the Office in handling Shafi's concern demonstrates the opposite.

Shafi points to no other ethical rule which might even be arguably violated by the Office's continued participation, because there are none. That is fatal to his motion.

**4. Attorney 1's former role as a supervisor in the Office is not a basis for recusal.**

Shafi argues that Attorney 1's position as a supervisor in the office exerts an influence on the prosecution team that cannot be cured with an ethical wall. Dkt. 64, Def.'s Mot. to Dismiss at 14. Shafi does not specify what ethical violation arises from this fact. And indeed, there is no legal authority that would require the recusal of the entire Office on this basis. The Ninth Circuit has explained that in this circumstance, the "generally accepted remedy" is to disqualify Attorney 1 herself. *See Williams,* 68 F.4th at 574*; see also Bolden,* 353 F.3d at 878 (citing *Young,* 481 U.S. at 807 (finding an actual conflict of interest when prosecutor represented another party benefiting from case). But no case supports Shafi's assertion that recusal of the entire office is required because the supervisor—even if recused from the case—might have incidental influence over their subordinates.

Shafi cites only *Minkkinen* in support of his theory. In that case a district court in West Virginia recused every AUSA in an office because the United States Attorney had previously represented the defendant in the case. In support of this decision, the court explained "[w]hen a prosecutor's "ability to fairly evaluate evidence from his [or her] boss could reasonably be questioned," there would be a risk of a mistrial. Dkt. 64, Def.'s Mot. to Dismiss at 14 (citing *Minkkinen*, 2023 WL 3587757, at *6). And it was apparently to avoid this risk that the district court recused the entire office. But *Minkkinen* itself explained that "[a]n attorney who previously represented a party may be effectively screened, such that no knowledge or information gained during the representation is transferred to attorneys working on the case." 2023 WL 3587757, at *5.

And in any case, the facts in that case were very different. First, in *Minkkinen* the conflicted attorney was the United States Attorney, who unarguably had a supervisory role over the AUSA prosecuting the case. Second, the conflicted United States Attorney was going to be a trial witness, forcing the AUSA to examine his current supervisor. *Minkkinen*, 2023 WL 3587757, at *6. But as described

above, Attorney 1 did not supervise any of the prosecutors who charged this case at the time charges were presented. And because Attorney 1 is no longer at the Office, she does not supervise any attorney who may need to examine her at trial.

And even if the reasoning of *Minkkinen* was applicable, district courts in this Circuit (and indeed, in this district) have reached the opposite conclusion. In *Nosal*, former Chief Judge Patel considered whether an NDCA AUSA should be recused in a situation where the United States Attorney was conflicted, but where the Department of Justice had assigned an Assistant Attorney General from outside the Office to supervise the NDCA AUSA with respect to that matter. 2009 WL 482236 at *2. The court found that there was no provision of the Rules of Professional conduct, California law, or Federal law that required recusal of the NDCA AUSA simply because the United States Attorney had recused. *Id.* at *2-*4. The facts of this case are similar to *Nosal*, since supervision of this case was moved out of the Office and the charges were approved by the Fraud Section. In fact, the appearance of conflict is much less severe here, since Attorney 1 had no supervisory role over the prosecutors who ultimately charged case.

Similarly, in *Glob. One Grp., LLC*, the district court refused to recuse an entire office simply because the United States Attorney was conflicted, explaining that "there is no requirement that the court recuse an AUSA or a USAO based on the imputed conflict from a new USA." 2010 WL 3259915, at *1. That holding is inconsistent with Shafi's theory that a supervisor's conflict requires recusal of their subordinates. Other courts to consider the question have reached the same conclusion. *See, e.g., Rodella*, 59 F. Supp. 3d at 1367-8.

**5. Even if Attorney 1 appears as a witness at trial, there is no reason members of the case team cannot fairly examine her.**

Shafi's final theory for why the Office must recuse is that Attorney 1 may be a witness at trial.[13]

[13] Shafi claims that Attorney 1 will be a witness at trial on two issues. The first is her alleged role in the "preservation and collection of data" from Shafi, which he claims is relevant to Count 8. The second is an allegation that Attorney 1 "helped write" the email that Shafi sent on September 28, 2022, forming the basis of Count 6. Dkt. 64, Def.'s Mot. to Dismiss at 14. In support of this claim, Shafi cites Exhibit D, which he describes as "Attorney 1 Email to IRL Counsel." *Id.* Shafi asked to file this email *ex parte*, because he believed that IRL might claim privilege. Shafi Motion to Seal. Shafi does not state whether he has conferred with IRL regarding its position on privilege. Regardless, likely because this is a privileged document, and because the privilege holder, IRL, has not waived privilege, the government does not have this email. It is therefore unable to respond to Shafi's claims about what it says, or comment on its implications for this motion.

This is an issue, he argues, because "[t]he Office would have to weigh the credibility, conduct, and exculpatory knowledge of its own former leader while prosecuting the case she helped build." Dkt. 64, Def.'s Mot. to Dismiss at 17. This risks mistrial, Shafi argues, because the "prosecutor's ability to fairly evaluate a former boss' evidence may 'reasonably' be doubted and viewed through the lens of institutional loyalty." *Id.* Shafi again cites *Minkkinen* in support of his claim that these facts require recusal. But in *Minkkinen* the conflicted attorney was the United States Attorney, in the supervisory chain of the prosecuting AUSA. And he was the *current* United States Attorney, not a former colleague. *Minkkinen*, therefore, provides no basis recusing the entire office.

The Ninth Circuit has addressed this question, suggesting that a member of the office being a witness might be one of the "limited circumstances" that would justify "disqualification of a single prosecutor" whose testimony was required at trial. *See Thanh Viet Cao*, 526 F. App'x at 800. But there is no precedent in the Ninth Circuit holding that a member of the Office being a witness requires recusal of the entire office. And there is no precedent anywhere in which a Court held that a *former* member of the Office being a witness creates any sort of conflict at all, much less a conflict so severe that the extreme remedy of recusing an entire office is required. The Ninth Circuit instead has rejected the argument that the entire office must be recused if members of that office—including the United States Attorney himself—testify at trial. *Lorenzo*, 995 F.2d at 1453.

The reasoning of *Minkkinen* underscores why there is no such conflict arising from a former employee being a witness. The court in *Minkkinen* was concerned that the conflicted United States Attorney "remains ultimately responsible for [] supervision and employment status" of the assigned AUSA, "including raises, promotions, and discipline." 2023 WL 3587757 at *3. It was only in this context that the AUSA's "ability to fairly evaluate evidence from his boss could reasonably be questioned." *Id.* at *6. Those conditions are not present in this case. Attorney 1 has no authority over the "employment status," "raises," "promotions," or "discipline" of any member of the prosecution team. Even when she was employed at the Office, she only had supervisory authority over one member of the prosecution team, but even that only for a few months and not when the case was charged. And to the extent that there is any lingering issue with a member of the Office examining a former colleague, the Criminal Division attorney who has been assigned to this case team could handle the examination.

Attorney 1 may or may not be a witness at trial.[14] If she is, her former position at the Office provides no basis for taking the drastic step of recusing the entire United States Attorney's Office. And Shafi has provided no authority that suggests a different result.

**B. There Is No Basis To Dismiss The Indictment.**

Shafi has not cited a single case where a Court took the extreme step of dismissing an indictment on the basis of a conflict of interest. In the cases in this Circuit that have considered whether recusal is required by a conflict, courts have never suggested that a conflict, even a conflict warranting recusal, would require a dismissal. *See, e.g., Lorenzo*, 995 F.2d at 1453; *Nosal*, 2009 WL 482236, at *4; *Rodella*, 59 F. Supp. 3d at 1348–49. This makes sense: it is hard to see how a conflict of interest could ever meet the high standard for dismissing an indictment on the basis of prosecutorial misconduct. Certainly nothing in this record comes close to meeting that high bar.

Shafi claims that "because the conflict infected the manner in which the prosecutors obtained the indictment, dismissal without prejudice is the right remedy." *See* Dkt. 64, Def.'s Mot. to Dismiss at 18 (quoting *Samango*, 607 F.2d at 885).[15] But Shafi does not explain *how* Attorney 1 improperly influenced the manner in which the indictment was secured. He alleges that Attorney 1 was chief of the section that investigated and presented the case to the Grand Jury. But this is incorrect. This was not a Corporate and Securities Fraud case; it was co-staffed with attorneys from both the Corporate and Securities Fraud section and Oakland Branch, but supervised by the Oakland Branch (and later the Fraud Section). He alleges that Attorney 1 supervised the attorneys who investigated and presented the case. But this is incorrect. One AUSA was briefly under Attorney 1's supervision, but was moved out in order to alleviate

[14] Given that Attorney 1 was retained by IRL and then IRL's Special Committee, the government does not believe Shafi can waive attorney-client privilege. Thus, it is not clear how Shafi plans to call Attorney 1 as a witness at trial.

[15] Shafi's motion also seems to suggest that the *Williams* test for the recusing an entire United States Attorney's Office is also the standard for dismissing an indictment on the basis of an apparent conflict. *See* Dkt. 64, Def.'s Mot. to Dismiss at 18. That standard requires a showing of a substantial factual basis for recusal, including prejudice to the defendant, and identification of a legal or ethical violation that will result from the Office's continued participation. The correct test for dismissing an indictment on the basis of prosecutorial misconduct requires the greater showing of flagrant misconduct and substantial prejudice. *Kearns*, 5 F.3d at 1253–54. Shafi does not engage with this standard at all: he does not event attempt to show flagrant misconduct or substantial prejudice. Nevertheless, as described at length above, Shafi has failed to meet the *Williams* standard for recusal. And so it follows that he also fails to meet the much more exacting *Kearns* standard for dismissing an indictment.

any conflict. Shafi does *not* allege that Attorney 1 shared confidential or prejudicial information with members of the investigative team. And indeed, she did not. He also does not allege that Attorney 1 reviewed or approved the charges. And he could not, since Attorney 1 left the Office months before the charges were approved and presented to the Grand Jury.

Nothing Shafi has argued amounts to either flagrant misbehavior or substantial prejudice, the two showings he must make to obtain dismissal. *Kearns*, 5 F.3d at 1253–54. Certainly he has not described anything "so grossly shocking and outrageous as to violate the universal sense of justice." *Id*. Nor has Shafi presented any basis for dismissing the indictment, as opposed to a less restrictive remedy (already voluntarily taken by the Office), such as recusing any attorneys that the Court determines are conflicted. Shafi's request is without precedent, unsupported by the facts or the law, and should be denied.

**CONCLUSION**

For these reasons, Shafi's motion should be denied in full.

DATED: August 17, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

LORINDA I. LARYEA
Chief, White Collar and Corporate
Enforcement Section
Criminal Division
U.S. Department of Justice

/s/

SAILAJA M. PAIDIPATY
EVAN M. MATEER
Assistant United States Attorneys

LAURA CONNELLY
Acting Assistant Chief
Fraud Section, U.S. Department of Justice